JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JASON WOJCICKI, Individually and on Behalf of All Others Similarly Situated

## DEFENDANTS

AIRGAS, INC., JOHN P. CLANCEY, JAMES W. HOVEY, RICHARD C.ILL, PETER MCCAUSLAND, TED B. MILLER, JR., MICHAEL L. MOLININI, JOHN C. VAN RODEN, PAULA A. SNEED, DAVID M. STOUT, LEE M. THOMAS, ELLEN C. WOLF

**(b)** County of Residence of First Listed Plaintiff    LAKE COUNTY, IN
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    DELAWARE COUNTY
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
JAMES R. BANKO
FARUQI & FARUQI, LLP
101 Greenwood Avenue, Suite 600, Jenkintown, PA 19046
(215) 277-5770

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from Another District *(specify)*    ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Section 1331
Brief description of cause:
Violation of Securities Exchange Act 14(a) and 20(a)

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE          DOCKET NUMBER

DATE
12/23/2015

SIGNATURE OF ATTORNEY OF RECORD
/s/ James R. Banko (#63344) JRB-9686

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

JS 44 Reverse  (Rev. 12/12)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I. (a)**    **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**    **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**    **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
   United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
   United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
   Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
   Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.**    **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**    **Nature of Suit.**  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

**V.**    **Origin.**  Place an "X" in one of the six boxes.
   Original Proceedings.  (1) Cases which originate in the United States district courts.
   Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.
   Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
   Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
   Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
   Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

**VI.**    **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**    **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
   Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
   Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**    **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff: 2434 Walnut Drive, Highland, IN 46322

Address of Defendant: 359 North Radnor-Chester Road, Suite 100, Radnor, PA 19087-5283

Place of Accident, Incident or Transaction: Radnor, PA

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes☐   No☐

Does this case involve multidistrict litigation possibilities?    Yes☐   No☒

*RELATED CASE, IF ANY:*

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐   No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☐   No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐   No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐   No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

**A.** *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☒ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
     (Please specify) _____

**B.** *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
     (Please specify) _____

## ARBITRATION CERTIFICATION

*(Check Appropriate Category)*

I, James R. Banko , counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒ Relief other than monetary damages is sought.

DATE: 12/23/2015     /s/ James R. Banko     63344

                Attorney-at-Law               Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 12/23/2015     /s/ James R. Banko     63344

                Attorney-at-Law               Attorney I.D.#

CIV. 609 (5/2012)



**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| JASON WOJCICKI, et al. | : | CIVIL ACTION |
| v. | : | 15   6787 |
| AIRGAS, INC., et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.                    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.                    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court.  (See reverse side of this form for a detailed explanation of special
management cases.)                     (x)

(f) Standard Management – Cases that do not fall into any one of the other tracks.          ( )

_James R. Banko_

| | | |
|---|---|---|
| 12/23/2015 | James R. Banko | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-277-5770 | 215-277-5771 | jbanko@faruqilaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

DEC 23 2015

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JASON WOJCICKI, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>    v.<br><br>AIRGAS, INC., JOHN P. CLANCEY, JAMES W. HOVEY, RICHARD C. ILL, PETER MCCAUSLAND, TED B. MILLER, JR., MICHAEL L. MOLININI, JOHN C. VAN RODEN, JR., PAULA A. SNEED, DAVID M. STOUT, LEE M. THOMAS, ELLEN C. WOLF,<br><br>                Defendants. | Civil Action No.<br><br>CLASS ACTION |

## CLASS ACTION COMPLAINT

Plaintiff Jason Wojcicki  ("Plaintiff"), by his attorneys, alleges for his complaint against Defendants, alleges upon personal knowledge as to himself, and upon information and belief and the investigation of his attorneys including the review of publicly disseminated information and filings with the Securities and Exchange Commission ("SEC") as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a stockholder class action brought by Plaintiff on behalf of himself and all other similarly situated public stockholders of Airgas, Inc. ("Airgas" or the "Company") against the Company and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

Act") and Rule 14a-9 promulgated thereunder, in connection with the proposed buyout (the "Buyout" or the "Proposed Transaction") of Airgas by the French multinational corporation L'Air Liquide, S.A. ("Air Liquid").

2.      On November 17, 2015, Airgas and Air Liquid publicly announced that they had entered into a definitive agreement (the "Merger Agreement") pursuant to which Air Liquid's wholly-owned Delaware subsidiary, AL Acquisition Corporation ("Merger Sub"), will merge with and into Airgas (the "Merger"), with Airgas surviving the Merger as a new wholly owned subsidiary of Air Liquid.  The Proposed Transaction has an enterprise value of approximately $13.4 billion.  Under the terms of the Merger Agreement, Airgas stockholders will be entitled to receive $143.00 in cash for each share of Airgas common stock they own (the "Merger Consideration").

3.      Concurrently with the execution of the Merger Agreement, the Individual Defendant Peter McCausland (and his spouse) entered into a Voting and Support Agreement with Air Liquid pursuant to which the McCauslands agreed to vote the shares of Airgas common stock they own individually and jointly, representing 9.43% of the total outstanding shares of common stock, in favor of the Proposed Transaction.

4.      Defendants have agreed to unreasonable deal-protection terms in the Merger Agreement that unfairly favor Air Liquid and discourage potential bidders from submitting a superior offer for the Company.   These preclusive devices include: (i) a non-solicitation provision that restricts the Board from soliciting other potentially superior offers for the Company; (ii) an "information rights" provision, which provides Air Liquid with unfettered access to information about other potential proposals, (iii) a "matching rights" provision that

gives Air Liquid four business days to match any competing offer, and provides Air Liquid with the perpetual right to attempt to match any superior offer; and (iv) a termination fee of a whopping *$400 million* if Air Gas determines to accept a superior offer, which deters other potential suitors from making a superior proposal.

5.      The Individual Defendants agreed to these unreasonable deal protection devices to ensure the Proposed Transaction cannot be threatened after allowing the Individual Defendant, Peter McCausland, the Company's founder, to single handedly run a deficient process, with little to no Board supervision, geared for the sole purpose of selling the Company to Air Liquid.

6.      Defendants violated Sections 14(a) and 20(a) of the Exchange Act by causing a materially incomplete and misleading Preliminary Schedule 14A Proxy Statement ("Proxy") to be filed with the SEC on December 8, 2015 that recommends that Airgas stockholders vote in favor of approving the Proposed Transaction. The Proxy violates the Exchange Act because it contains materially misleading information and/or fails to disclose material information that renders other information Proxy misleading, concerning (i) McCausland's woefully deficient process that led to the Board approving the Proposed Transaction; (ii)  the Company's financial projections; and (iv) the financial analyses of the Proposed Transaction performed by Airgas' financial advisors, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA") and Goldman Sachs & Co. ("Goldman Sachs").

## JURISDICTION AND VENUE

7.      Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  17 C.F.R. § 240.14a-9.

8.    The Court has personal jurisdiction over Defendants because each is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Airgas maintains its primary place of business in this District.

## THE PARTIES

10.    Plaintiff is and was, at all times relevant hereto, a holder of Airgas common stock.

11.    Defendant Airgas (NYSE:ARG) is a Delaware corporation with principal executive offices at 359 North Radnor-Chester Road, Suite 100, Radnor, PA 19807-5283. Airgas is a producer and supplier of industrial, medical and specialty gases, and hardgoods, such as welding equipment and related products.  The Company also makes atmospheric gases with 16 air separation plants, carbon dioxide, dry ice, and nitrous oxide, and is a supplier of refrigerants, ammonia products, and process chemicals.

12.    Defendant John P. Clancey has served as a director since 2010 and is a member of the Audit Committee.

13.    Defendant James W. Hovey has served as a director since 1999 and is a member of the Audit and the Finance Committees.

14.    Defendant Richard C. Ill has served as a director since 2013 and is a member of the Executive Committee and the Governance and Compensation Committee.  He previously was a Board member from 2004 to 2010.

15.     Defendant Peter McCausland ("McCausland") is the founder of the Company, served as a director since 1987 and is the Executive Chairman serving on the Executive Committee.   He served as Chairman of the Board from 1987 to September 15, 2010 and from August 29, 2011 to August 2012. Mr. McCausland also served as the Chief Executive Officer of Airgas from May 1987 to August 2012 and President of Airgas from June 1986 to August 1988, from April 1993 to November 1995, from April 1997 to January 1999 and from January 2005 to August 2012. McCausland and his spouse individually and jointly own Airgas common stock representing 9.4% of the Company's outstanding shares.

16.     Defendant Ted B. Miller, Jr. has served as a director since 2010 and is a member of the Governance and Compensation Committee.

17.     Defendant Michael L. Molinini has served as a director since 2012 and is a member of the Executive Committee.   Molinini served as Executive Vice President and Chief Operating Officer of Airgas from January 2005 to August 2012.   Molinini previously served as Senior Vice President - Hardgoods Operations from August 1999 to January 2005 and as Vice President - Airgas Direct Industrial from April 1997 to July 1999.

18.     Defendant John C. van Roden, Jr. has served as a director since 2006 and serves on the Audit and the Finance Committees.

19.     Defendant Paula A. Sneed has served as a director since 1999 and serves on the Audit and Governance and Compensation Committees.

20.     Defendant David M. Stout has served as a director since 1999 and is a member of the Executive, Governance and Compensation, and Finance Committees.

21.     Defendant Lee M. Thomas has served as a director since 1998 and is a member of the Executive, Governance and Compensation, and Finance Committees.

22.     Defendant Ellen C. Wolf has served as a directors since 2008 and is a member of Audit and Finance Committees.

23.     Defendants John P. Clancey, James W. Hovey, Richard C. Ill, Peter McCausland, Ted B. Miller, Jr., Michael L. Molinini, John C. van Roden, Paula A. Sneed, David M. Stout, Lee M. Thomas, Ellen C. Wolf are referred to herein collectively as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this Action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Airgas common stock who are holders of records and entitled to vote on the Proposed Transaction and are being and will be harmed by Defendants' actions described herein (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the defendants.

25.     This action is properly maintainable as a class action for the following reasons:

(a)  The Class is so numerous that joinder of all members is impracticable. The number of shares of Airgas common stock outstanding as of November 20, 2015, was over 72.2 million.  These millions of shares likely owned by thousands of shareholders.

(b)  Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiffs has the same interests as the other

members of the Class.  Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

(c)   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially members or impede their ability to protect their interests.

(d)   To the extent Defendants take further steps to effectuate the Merger, preliminary and final injunctive relief on behalf of the Class as a whole will be entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

26.    There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member.   The common questions include, *inter alia*, the following:

(a)   Whether Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)   Whether the Individual Defendants violated Section 20(a) of the Exchange Act; and

(c)   Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated as presently anticipated.

## SUBSTANTIVE ALLEGATIONS

### The Buyout is Flawed and Unfair

27.     Airgas, founded in 1986, is a supplier of industrial, medical and specialty gases, and hard goods, such as welding equipment and related products. The Company is also a producer of atmospheric gases, carbon dioxide, dry ice and nitrous oxide and a supplier of safety products, refrigerants, ammonia products and process chemicals.   The Company operates through two segments: Distribution and All Other Operations. The Company also offers supply chain management services and solutions, and product and process technical support across many customer segments.   The Company markets its products and services through multiple sales channels, including branch-based sales representatives, retail stores, strategic customer account programs, telesales, catalogs, e-business and independent distributors.

28.     The Company's Distribution segment's principal products include industrial, medical and specialty gases sold in packaged and bulk quantities, as well as hard goods. The Company's air separation facilities and national specialty gas labs primarily produce gases that are sold by the various regional and other business units within the Distribution segment as part of the complementary suite of similar products and services for the Company's customers. Gas sales primarily include atmospheric gases, including nitrogen, oxygen and argon; helium; hydrogen; welding and fuel gases, such as acetylene, propylene and propane; carbon dioxide; nitrous oxide; ultra-high purity grades of various gases; special application blends and process chemicals. The Distribution segment also includes rental of its gas cylinders, cryogenic liquid containers, bulk storage tanks, tube trailers and welding-related and other equipment. Hard goods consist of welding consumables and equipment, safety products, construction supplies and

8

maintenance, repair and operating supplies. The Company's customer base includes manufacturing and metal fabrication; non-residential (energy and infrastructure) construction; life sciences and healthcare; food, beverage and retail; energy and chemical production and distribution; basic materials and services, and government and other.

29.     The Company's All Other Operations segment consists of five business units. The primary products produced or supplied are carbon dioxide, dry ice (carbon dioxide in solid form), nitrous oxide, ammonia and refrigerant gases. Airgas is a producer of liquid carbon dioxide and dry ice. Customers for carbon dioxide and dry ice include food processors, food service businesses, various businesses in the pharmaceutical and biotech industries, and wholesale trade and grocery outlets, with food and beverage applications. With 14 dry ice plants (converting liquid carbon dioxide into dry ice), Airgas has a network of dry ice conversion plants in the United States. Additionally, Airgas operates eight liquid carbon dioxide production facilities.

30.     The Company is a producer of nitrous oxide gas in the United States through its three nitrous oxide production facilities. Nitrous oxide is used as an anesthetic in the medical and dental fields, as a propellant in the packaged food industry and in certain manufacturing processes in the electronics industry. Airgas is a distributor of anhydrous and aqua ammonia. Industrial ammonia applications primarily include the abatement of nitrogen oxide compounds ("DeNOx") in the utilities industry, chemicals processing, commercial refrigeration, water treatment and metal treatment. The Company operates 29 distribution facilities across the United States. The Company's refrigerants are used in a range of commercial and consumer freezing and cooling applications. Airgas purchases and distributes refrigerants and provides technical

and refrigerant reclamation services. The primary focus of the refrigerants business is on the sale, distribution and reclamation of refrigerants, with a varied customer base that includes small and heating, ventilating, and air conditioning ("HVAC") contractors and distributors, facility owners, transportation companies, manufacturing facilities and government agencies.[1]

31.     In or around 2010-2011, the Company was involved in an attempted hostile take-over bid by a rival company, Air Products and Chemicals ("APC") that led to litigation in Delaware Chancery Court and allegations that certain of APC's counsel advising on the hostile bid were conflicted due to prior work for Airgas, and similarly that Airgas' advisor, Goldman Sachs was conflicted for work it had performed for APC.  After the Delaware Chancery Court upheld Airgas' defensive measures, including a poison pill provision, the APC withdrew its hostile bid.

32.     On November 17, 2015, Air Liquid announced the Merger Agreement in a joint press release which stated in part:

## AIR LIQUIDE ANNOUNCES AGREEMENT TO ACQUIRE AIRGAS

- *Air Liquide to acquire U.S.-based Airgas for U.S. $143 per share in cash, or a total enterprise value of $13.4 billion*

- *Game-changing combination that strengthens Air Liquide's global leadership with #1 position in North America, complementing its #1 positions in Europe, Africa / Middle East and Asia-Pacific, and provides new opportunities to Airgas customers*

- *Air Liquide ideally positioned for future growth with a stronger presence in the U.S., the largest industrial gases market in the world*

- *The transaction is expected to be accretive from year one*

---

[1] http://www.reuters.com/finance/stocks/companyProfile?symbol=ARG.

- *Combined company to deliver greater value, service and innovation to customers in North America and around the world*

**Paris, France, and Radnor (Pennsylvania), USA – 17 November 2015 –** Air Liquide (Euronext Paris: AI), world leader in gases, technologies and services for Industry and Health, and Airgas (NYSE: ARG), one of the leading suppliers of industrial gases and associated products and services in the U.S., today announced an agreement under which Air Liquide will acquire Airgas. Airgas shareholders will receive $143 per share in cash for all outstanding shares of Airgas, representing a total enterprise value of $13.4 billion (€12.5 billion at current exchange rates1) on a fully diluted basis and including the assumption of Airgas debt.

The transaction represents a premium of +50.6% to Airgas' one month average share price, prior to the announcement of the transaction, and of +20.3% over Airgas' 52-week high share price1.

In the transaction, Airgas will become a wholly-owned subsidiary of Air Liquide.

**Benoît Potier, Chairman and CEO of Air Liquide, said**:

"This combination offers significant benefits for all of our stakeholders due to the highly complementary nature of the two businesses. It also advances Air Liquide's vision to lead the industry and deliver long-term performance while acting responsibly. This acquisition increases our geographic reach in the resilient U.S. market, and offers continuous growth opportunities. Airgas is the industry leader in U.S. packaged gases with a customer-centric organization and we are confident in our ability to successful combine operations. Airgas is a unique partner, and together we will continue to advance our strategy based on profitable growth and innovation over the long-term."

He added, "We have the highest respect for Airgas, its organization, its employees and its stakeholders, as well as for what they have achieved over more than 30 years. We look forward to working with their teams as we move to complete the transaction and combine both businesses."

**Peter McCausland, Executive Chairman of Airgas, said:**

"This transaction is compelling for our shareholders, arising from the persistent execution of our business strategy for more than three decades. Air Liquide's long-term vision and strong heritage in the U.S. make it the right fit for our valued customers, and the combination creates significant

opportunities for the talented employees of both companies. Airgas customers and employees will benefit from Air Liquide's unrivalled global footprint and strength in technology, innovation and operational efficiency, while Airgas is ready to bring the entrepreneurial culture and packaged gas excellence that have driven our success to date. We are excited about the prospects of integrating these two businesses to create the largest industrial gas company in the world. We look forward to working closely with Air Liquide to complete the transaction and achieve a smooth transition."

**Strategic Rationale**

Combining Air Liquide and Airgas will bring together two highly complementary businesses to deliver greater value, service and innovation to customers in North America and around the world. In the U.S., Airgas' leadership in the packaged gases business and associated products and services and Air Liquide's strong footprint in complementary activities will increase the scope and competitiveness of the combined companies' product offering.

This acquisition gives Air Liquide a greater presence in the U.S. market, the largest for industrial gases worldwide, and will ideally position Air Liquide for future growth. In addition, there is potential for further growth using Airgas' footprint to accelerate the deployment of Air Liquide's technologies.

The combination builds on Air Liquide's longstanding track record of successfully operating in the U.S. and will benefit from Airgas' unmatched national presence and its more than 1 million customers in the U.S., as well as from its leading customer-facing platform including e-commerce and telesales capabilities. The combined entity will be able to better serve customers with the most advanced multi-distribution networks in the U.S. and more competitive product offerings thanks to an integrated upstream-downstream model.

The acquisition will reinforce Air Liquide's global leadership position, increasing Gas & Services sales by around + 30%. Upon completion of the acquisition, the combined company will be the leader in North America, complementing number one positions in Europe, Africa/Middle East and Asia-Pacific. It will also be number one in Industrial Merchant and Large Industries, and co-number one in Electronics, worldwide.

The combined company will continue to implement an innovation strategy that combines scientific expertise, industry-leading technology and customer insight to bring new products and services to market. It will also improve existing offerings and open new markets, in particular by leveraging digital

technologies. In addition, this combination will create new opportunities for employees as part of a leading global organization that is ideally positioned for growth.

**Financial Benefits**

Air Liquide's acquisition of Airgas represents significant value for shareholders of both companies. Upon completion, Airgas shareholders will receive immediate and substantial cash value for their shares.

Air Liquide's management has a proven track record of executing and integrating acquisitions. The transaction is expected to be accretive from year one. Air Liquide plans to realize more than $300 million of pre-tax cost, efficiency and volume synergies; the majority within two to three years. The company's objective is to maintain its S&P 'A-/A' credit rating. Air Liquide has committed bridge financing for the transaction and intends to refinance through a capital increase in the range of €3 billion to €4 billion, and a combination of U.S. dollar and Euro long-term bonds.

**Timing and Conditions**

The transaction is subject to Airgas shareholders' approval, receipt of necessary antitrust and other regulatory approvals and other customary conditions and provisions. The two parties wish to proceed swiftly.

33.     Although the Merger Consideration represents a premium to the Company's recently artificially depressed stock trading price, it fails to reflect the Company's inherent and long-term value and thus is unfair.

34.     The Company's recent financial reports have been impressive in a challenging market.  Although the Company faced general market headwinds in 2015 that temporarily impacted the trading price for its stock, the Company's stock price previously had steadily increased.  And, while the Company's stock price in 2015 has traded lower than its prior steady upward trend, the Company has reported solid positive financial metrics.  For example, for the Company's second fiscal quarter 2016 earnings release, Air Gas reported earnings per diluted share of $1.31 for its second quarter ended September 30, 2015, up 1% compared to the prior

year earnings per diluted share of $1.30, in line with the Company's expectations and reflective of the challenging economic conditions.  Second quarter sales increased 1% over the prior year to $1.4 billion. Organic sales were flat compared to the prior year, with gas and rent up 3% and hardgoods down 5%. In the Distribution segment, organic sales were down 1% compared to the prior year, with gas and rent up 2% and hardgoods down 5%. In the All Other Operations segment, organic sales were up 8%, primarily driven by increased sales in the refrigerants, $CO_2$ and dry ice businesses. Acquisitions contributed sales growth of 1% in the quarter on both a consolidated basis and in the Distribution segment and 8% in the All Other Operations segment.

35.     Airgas Chief Executive Officer ("CEO") and member of the Board, Michael L. Molinini stated:

> Our results continue to reflect the challenging industrial economy with sales to customers in our energy and chemical, and manufacturing and metal fabrication end markets down year-over-year in the mid-single digits. However, our diversified end customer markets and continued strength in non-residential construction, together with tight expense management, helped to mitigate the impact of the sales declines in those end markets…The quarterly results demonstrated the resilience of our business during difficult economic times. In addition, despite flat sales and earnings, cash flow remains strong, with year-to-date free cash flow* up 15% over the prior period.

36.     Moreover, while noting the overall weak industrial demand in the near term, McCausland stated:

> Long-term, we believe the fundamental growth prospects for the U.S. economy are strong. The significant investments we have made and continue to make in our gas business position Airgas for industry leading growth … Consistent with our demonstrated track record, we remain committed to delivering sustainable long-term value to our customers and shareholders.

37.     Thus, for guidance going forward, Airgas provided that: "For the full fiscal year 2016, the Company expects earnings per diluted share in the range of $4.90 to $5.00, reflecting a 1% to 3% increase over prior year earnings per diluted share. Full year guidance includes a $0.00 to $0.04 per diluted share negative year-over-year impact from variable compensation reset following a below-budget year as well as a $0.07 to $0.09 per diluted share negative year-over-year impact from near term net cost pressure related to helium diversification and supply extension initiatives and a net $0.09 per diluted share benefit from share repurchases made through September 30.  Full year guidance assumes a year-over-year organic sales growth rate in the low single digits."

38.     The Proposed Transaction comes at a time when the Company is poised to increase its profitability.  A buy-out of Airgas' public stockholders on the terms offered will deny Class members their right to share proportionately and equitably in the true value of Airgas' valuable and profitable business, and in further growth in profits and earnings.

39.     Indeed, the Proxy describes a woefully inadequate sales process driven solely by McCausland with no input or guidance from the Board and rubber stamped by the Company's conflicted financial advisors that was intended from the outset to sell the Company to Air Liquid so that McCausland can reap tremendous profits from his equity holdings in the Company.

40.     From 2014 through the announcement of the Proposed Transaction, McCausland steered the Company into the arms of Air Liquid. According to the Proxy, McCausland discussed a potential stock-for-stock "merger of equals" with the CEO of Company 1 in November 2014. Although not disclosed in the Proxy, Company 1 may be APC due to the reference to a prior commercial dispute between the companies about which McCausland and the Company 1 CEO

had met to discuss over the last twelve months.  Included with these discussions were discussions of a possible strategic transaction.  McCausland rebuffed Company 1's overtures in November 2014 without consulting with the Board although he appears at some point to have informed the Board of his discussion and his response.  Nevertheless, Company 1 continued to express interest in a stock-for-stock deal with Airgas in April 2015.  McCausland continued to rebuff Company 1's overtures, expressing his view that Company 1's general interest in a stock-for-stock transaction was not in the Airgas stockholders' best interest and that the Airgas Board felt similarly. During this time, McCausland was in contact with Air Liquid discussing among other things joint ventures outside the U.S. and a potential strategic transaction.

41.     In October 2015, Company 1 made a proposal to McCausland for a merger of Airgas with Company 1 in a stock-for-stock transaction with a fixed exchange ratio of approximately $114.00 per Airgas share. Company 1 indicated that it believed there were significant cost synergies from a transaction of the two companies that would impact this value. Company 1 also indicated that its board of directors would be willing to proceed with a transaction whether the Airgas Board was supportive or not.   Company 1 and Airgas representatives met one time on October 20, 2015 to review the proposal, but Company 1 had no chance to succeed in a strategic transaction with Airgas as McCausland stalled and delayed negotiations with Company 1 while pressing forward with a transaction with Air Liquid. Indeed, at the only meeting between Company 1 and Airgas, the Proxy provides with no explanation that "it was noted" that the nearly one-third of the synergies expected by Company 1 were revenue synergies rather than identifiable cost synergies, attempting to cast doubt on the viability of the Company 1 proposal. Company 1 made no further progress with McCausland. Rather,

16

McCausland sought only to prevent Company 1 from going public with its interest in the Company.

42.     Meanwhile, McCausland pressed forward with his plans with Air Liquid. He and the Air Liquid CEO discussed a possible strategic transaction from the time Company 1 contacted McCausland. Indeed, McCausland informed Air Liquid's CEO of the terms of Company 1's proposal and soon after the Company 1 proposal, Airgas and Air Liquid entered into a non-disclosure agreement ("NDA"). The Company appears not to have entered into a non-disclosure agreement with any other interested party.

43.     Two other companies attempted to negotiate a strategic transaction with McCausland with no success. Company 2 made contact with McCausland on July 10, 2015. The Proxy provides that McCausland discussed the possibility of a strategic transaction between Airgas and Company 2 if Airgas received an acquisition proposal from another party. Of course, Airgas and Air Liquid already had been engaging in discussions about a possible strategic transaction. No effort was made to engage in negotiations with Company 2. Indeed, the only other contact between Airgas and Company 2 was on October 26, 2015 when the Company's Chief Financial Officer ("CFO") misled Company 2 by informing it that Airgas "may be in a position of considering a strategic transaction in the near future…" and that Company 2 should consider making its interest known. Of course, by October 26, 2015, Airgas had entered into the Air Liquid NDA and had ramped up its efforts to negotiate a transaction with Air Liquid.

44.     Another party, Company 3, contacted McCausland on September 10, 2015 after hearing second hand that Airgas was negotiating with Company 1. At an industry conference on November 7, 2015, the CEO of Company 3 told McCausland that a strategic transaction

17

involving cash and stock valued at $125.00 per Airgas share would be supported by his board and that it may even go higher depending on due diligence outcomes. On November 7, 2015, Airgas stock price closed at $96.95. McCausland did not discuss the Company 3 terms with the Airgas Board until November 16, 2015 the day before the Merger Agreement was executed.

45.     On October 29, 2015, Air Liquid's CEO and McCausland met to discuss terms of a transaction.  At this meeting, Air Liquid conveyed in a draft letter its proposal to acquire the Company in an all cash transaction, with the price to be negotiated. Air Liquid's CEO told McCausland that an all cash transaction was not available if the Company engaged in a multi-party sales process. Air Liquid also required McCausland to agree to vote his shares in favor of the proposal.  With little to no negotiations, McCausland agreed  that same day to support Air Liquid's proposal to acquire the Company in an all-cash transaction at $143.00 per Airgas share. Thus, at this single meeting, McCausland and the Air Liquid CEO effectively agreed to the Proposed Transaction.  There were discussions through November over the terms of the Merger Agreement (including the amount of the termination fee and a gas supply agreement after execution of a merger agreement) and the Board voted to approve the Proposed Transaction on November 71, 2015.

46.     BofA and Goldman Sachs were engaged at some point to advise the Board, but little information  is disclosed about the engagement process.  The Proxy fails to disclose the basis for retaining two financial advisors and if and the extent of any conflicts check undertaken by the Board prior to their engagement.

***Potential Conflicts of Interest – Individual Defendants***

47.     Pursuant to the terms of the Merger Agreement, certain of Airgas' directors and

executive officers stand to receive benefits not shared equally with Plaintiff and the Class.  These benefits include vesting and cash out of stock options, lucrative severance payments and benefits in certain circumstances, and indemnification and insurance coverage.  For instance, the total amount payable on the stock options to the Company's 11 executive officers is approximately $9,474,041.  Proxy at 45.

48.     Additionally, all notional investments denominated in Company common stock in the Company's deferred compensation plans will be converted into notional investments in cash, based on a price per share of Airgas' common stock equal to the merger consideration.

49.     The Company has entered into "change of control agreements" with certain executive officers that provides the following within the three years following a change of control:

- a lump sum cash severance payment equal to two times the sum of base salary (as in effect immediately prior to termination or, if greater, at the time of the change in control) and the executive's most recent annual bonus;

- reimbursement of all expenses related to medical, dental and prescription drug coverage for the executive and the executive's eligible dependents for three years following the date of termination; and

- full vesting of all outstanding stock options, with all such stock options to remain exercisable for the remainder of their applicable term.

Proxy at 46.

50.     The Change of Control Agreements provide that, upon a change of control, the Company will fund a rabbi trust with an amount equal to 120% of the payments and benefits that could become payable to all individuals under the Change of Control Agreements. *Id.* Total Change of Control payments is approximately $2,848,977.

51.     Certain of the Individual Defendants also qualify for the following benefits:

**Golden Parachute Compensation**

| Name | Cash ($)(1) | Equity ($)(2) | Perquisites/ Benefits ($)(3) | Total($) |
|---|---|---|---|---|
| Andrew R. Cichocki *Senior Vice President; President-Airgas USA, LLC* | 1,180,128 | 3,149,679 | 54,360 | 4,384,167 |
| Peter McCausland *Executive Chairman* | 4,821,840 | 2,426,651 | 52,380 | 7,300,871 |
| Robert M. McLaughlin *Senior Vice president and Chief Financial Officer* | 1,317,238 | 2,325,129 | 39,969 | 3,682,336 |
| Michael L. Molinini *President and Chief Executive Officer* | 2,939,580 | 8,348,500 | 39,969 | 11,328,049 |
| Robert H. Young, Jr. *Senior Vice President and General Counsel* | 1,112,334 | 1,104,620 | 62,254 | 2,279,208 |

Shaun Powers[2] *Division President*

(1) *Cash*.   Consists of the following: (i) under Mr. McCausland's Amended and Restated Executive Severance Agreement, a lump sum cash severance payment equal to two times his base salary as of December 4, 2015, and (ii) under the Change of Control Agreements with Messrs. Cichocki, McCausland, McLaughlin, Molinini and Young, a lump sum cash severance payment equal to two times the sum of the named executive officer's base salary as of December 4, 2015 and the named executive officer's most recent annual bonus. All such amounts are "double trigger" and payable only upon a qualifying termination of employment within three years following the effective time of the merger.

(2) *Equity*.   Consists of the value of unvested Company stock options held by each of the named executive officers that will be cancelled in exchange for a cash amount, in respect of each share of Company common stock subject to such Company stock option, equal to $143.00, which is the fixed dollar amount per share of Company common stock to be received by Company stockholders in the merger, less the applicable option exercise price (if positive). All such amounts are "single trigger," with payment triggered by the merger with no requirement or condition that the named executive officer's employment terminate.

---

[2] Mr. Powers announced his retirement effective August 2015. No payments, distributions or benefits that are based on, or otherwise relate to, the merger will be due to Mr. Powers.

(3) *Perquisites/Benefits*.  Consists of amounts reflecting the estimated expenses related to medical, dental and prescription drug coverage for each named executive officer and his eligible dependents for three years following the date of termination, as provided under the terms of the named executive officers' Change of Control Agreements. These amounts are based on the assumptions used for financial reporting purposes under generally accepted accounting principles. All such amounts are "double trigger" and payable only upon a qualifying termination of employment within three years following the effective time of the merger.

52.     McCausland alone is set to receive total payout of approximately $962 million from the Proposed Transaction.

53.     Based on the above, the Proposed Transaction is the product of an unfair and inadequate sales process.

***The Incomplete & Materially Misleading Proxy***

54.     On December 8, 2015, Airgas filed the Proxy with the SEC in connection with the Proposed Transaction.   The Proxy misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Proxy fails to provide the Company's stockholders with material information concerning both the process leading up to the consummation of the Merger Agreement and the financial analyses performed by BofA and Goldman Sachs in support of its fairness opinion.   As a result of the incomplete and misleading Proxy, Airgas' stockholders will be unable to make an informed decision concerning whether to vote for or against the Merger.

**Materially Incomplete and Misleading Disclosures Concerning the Background of the Proposed Transaction.**

55.     The Proxy fails to provide material information concerning the process conducted by the Board and the events leading up to the signing of the Merger Agreement.   In particular,

the *Background of the Merger* section contained on pages 25-30 of the Proxy is materially deficient in that it fails to disclose the following information:

(a)   The rationale for permitting Defendant McCausland to be the only Board member to engage in discussions with Air Liquid and Companies 1, 2 and 3 regarding a strategic transaction;

(b)   The rationale why the Board failed to create a committee to engage in a market check and/or thorough sales process of the Company;

(c)   The identity of Companies 1, 2 and 3;

(d)   The basis for McCausland's view that the stock-for-stock transaction discussed with  Company 1 on November 21, 2014 was not attractive to Airgas stockholders and that the Airgas Board similarly would view such a transaction as not attractive (Proxy at 25);

(e)   The authority for McCausland to inform Company 1 on November 21, 2014 that a stock-for-stock transaction would not be viewed as attractive by the Airgas Board (Proxy at 25);

(f)   The identity of the Airgas "senior executive" who contacted the CFO of Company 2 on October 26, 2015 (Proxy at 27);

(g)   The basis for the Airgas "senior executive" to represent to the CFO of Company 2 that Airgas "may be in a position of considering a strategic transaction in the near future", when at the time of that representation, Airgas was actively negotiating a strategic transaction with Air Liquid (Proxy at 27);

22

(h)  Detailed disclosure of the basis for work on the "5-year plan" discussed with the Board on November 16, 2015, line item metrics in the 5-year plan, and whether BofA and/or Goldman Sachs relied on data from 5-year plan in rendering their fairness opinions;

(i)  Detailed disclosure of the substance of discussions with Airgas officers and/or management regarding their post-transaction roles if any with the Company;

(j)  Detailed disclosure of actions taken by Board, if any, to determine whether BofA and/or Goldman Sachs had conflicts of interest in advising it with respect to the Proposed Transaction or discussions with any other entity interested in a strategic transaction with Airgas.

**Materially Incomplete and Misleading Disclosures Concerning Bankers' Potential Conflicts**

56.  Page 34 of the Proxy provides:

In connection with BofA Merrill Lynch's services as Airgas' financial advisor, Airgas has agreed to pay BofA Merrill Lynch an aggregate fee of approximately $37.5 million, a portion of which was payable upon public announcement of the merger and the balance of which is contingent upon completion of the merger. In addition, Airgas has agreed to reimburse BofA Merrill Lynch for its expenses, including fees and expenses of BofA Merrill Lynch's legal counsel, incurred in connection with BofA Merrill Lynch's engagement and to indemnify BofA Merrill Lynch and related persons against liabilities, including liabilities under the federal securities laws, arising out of BofA Merrill Lynch's engagement.

57.  The Proxy is false and misleading because it does not disclose the portion of BofA's approximately $37.5 million transaction fee which became payable upon announcement of the merger and the portion of BofA's approximately $37.5 million transaction fee which is contingent upon consummation of the Proposed Transaction

58.  Pages 36 of the Proxy further state:

23

Goldman Sachs has also provided certain financial advisory and/or underwriting services to Air Liquide and/or its affiliates from time to time for which its Investment Banking Division has received, and may receive, compensation. Goldman Sachs may also in the future provide financial advisory and/or underwriting services to Airgas, Air Liquide and their respective affiliates for which its Investment Banking Division may receive compensation. During the two year period ended November 17, 2015, the Investment Banking Division of Goldman Sachs has received compensation for financial advisory and/or underwriting services provided to Air Liquide and/or its affiliates of approximately $90,000.

Airgas selected Goldman Sachs as its financial advisor because it is an internationally recognized investment banking firm that has substantial experience in transactions similar to the transaction contemplated by the merger agreement. Under an engagement letter between Airgas and Goldman Sachs, for services rendered in connection with the merger, Goldman Sachs will be entitled to receive a fee of approximately $37.5 million, a portion of which was paid upon public announcement of the merger and the balance of which is contingent upon completion of the merger. In addition, Airgas agreed to reimburse Goldman Sachs for certain of its expenses and to indemnify Goldman Sachs and related persons against certain liabilities that may arise out of its engagement, including certain liabilities under federal securities laws.

59.     The Proxy is false and misleading because it does not disclose the portion of Goldman Sachs' approximately $37.5 million transaction fee of which became payable upon announcement of the merger and the portion of Goldman Sachs' approximately $37.5 million transaction fee which is contingent upon consummation of the Proposed Transaction.

**Materially Incomplete and Misleading Disclosures Concerning Management Projections and BofA and Goldman Sachs' Financial Analyses Relying on Those Projections**

60.     While the Proxy discloses certain information regarding the Company's financial projections and the financial analyses BofA and Goldman Sachs performed to support its fairness opinion, the information is incomplete and misleading.

61.     With respect to Airgas' projections (Proxy at 43-44), the Proxy fails to provide, among other things, the standalone financial projections prepared by Airgas management and

24

relied on by BofA and Goldman Sachs for purposes of its analysis that was presented to the Board on November 16, 2015 (Proxy at 29) for years 2016-2021, for unlevered free cash flow and the inputs for calculating unlevered free cash flow, including stock based compensation expenses ("SBC") (and the manner of treatment of SBC) and capital expenditures.  The Proxy further fails to disclose details concerning the 5-year plan and whether projection from the 5-year plan were provided to BofA and/or Goldman Sachs for their fairness opinion.

62.     The omission of this information renders the following statements in the Proxy (page 43-44)  false and/or materially misleading in contravention of the Exchange Act:

### Summary of the Projections
*(dollars in millions, except per share data)*

| | Projected Periods | | | | | |
|---|---|---|---|---|---|---|
| | For the fiscal year ended March 31, | | | | | |
| | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Revenue | $5,440 | $5,777 | $6,252 | $6,722 | $7,196 | $7,613 |
| EBITDA(1) | $  998 | $1,084 | $1,223 | $1,369 | $1,506 | $1,620 |
| Earnings Per Share | $ 4.98 | $ 5.53 | $ 6.38 | $ 7.34 | $ 8.43 | $ 9.49 |

63.     These statements in the Proxy are rendered false and/or misleading by the omissions identified in ¶57 as this information is integral to stockholders' evaluation of the consideration being offered in the Proposed Transaction.  Indeed, these financial projections provide a sneak peek into Airgas' expected future performance (i.e., growth/profitability) and, consequently, its value as a standalone entity.   The expected performance is more reliable than similar forecasts prepared by third-party analysts and other non-insiders as it comes from members of corporate management who have their fingers on the pulse of the Company. Furthermore, the Proxy expressly provides that unlevered free cash flows were relied on by

BofA and Goldman Sachs in their *Illustrative Discounted Cash Flow Analysis* (Proxy at 42). Accordingly, it is no surprise that financial projections are among the most highly sought after disclosures by stockholders in the context of corporate transactions such as this.

64.   With respect to BofA's *Selected Publicly Traded Companies Analysis,* the Proxy discloses on page 38-39 the high/low and median EBITDA and P/E multiples for 2016 from the selected companies, but fails to disclose the basis for the selected ranges of the P/E multiples used to derive the implied per share values for Airgas, which multiples range are outside the high/low ranges identified from the selected companies. The Proxy further fails to disclose the objective selection criteria employed by BofA in selecting the companies analyzed and the individual multiples used for each of the selected companies observed by BofA including (i) EV/2016E EBITDA, and (ii) Adjusted 2016E P/E.  The Proxy additionally fails to disclose the basis for Goldman Sachs' failure to perform a *Selected Publicly Traded Companies Analysis.*

65.   The omission of this information renders the following statements in the Proxy, pages 38-39, false and/or materially misleading in contravention of the Exchange Act:

*Selected Publicly Traded Companies Analysis*
*BofA Merrill Lynch*

Using publicly available information and consensus estimates published by Institutional Broker Estimate System, which we refer to as "IBES," BofA Merrill Lynch compared financial and operating information and ratios for Airgas with the corresponding information for a selected group of publicly traded companies. BofA Merrill Lynch selected these companies because they engage in businesses that for purposes of analysis may be considered similar to those of Airgas. The selected companies were:

- Praxair, Inc.
- Air Products and Chemicals, Inc.
- Air Liquide
- The Linde Group
- Taiyo Nippon Sanso Corporation

BofA Merrill Lynch calculated an implied equity value for each of these companies based on their respective closing share prices as of November 13, 2015 and the number of fully diluted shares of each, calculated based on its most recent publicly available SEC filings. BofA Merrill Lynch calculated an implied enterprise value for each company by adding to the implied equity value it calculated for the company the amount of each company's net debt as reflected in its most recent publicly available balance sheet.

Using estimates of 2016 EBITDA and EPS for each of these companies derived from IBES consensus estimates, the implied enterprise values it calculated for each company as described above and the company's closing share price as of November 13, 2015, BofA Merrill Lynch calculated the following implied multiples for each company:

- implied enterprise value as a multiple of 2016 estimated EBITDA, which we refer to as the "2016 enterprise value/EBITDA Multiple;" and
- the closing share price as a multiple of 2016 estimated EPS, which we refer to as the "2016 P/E Multiple."

A summary of the results of these calculations are reflected in the following table:

|  | Enterprise Value/2016 EBITDA Multiple | 2016 P/E Multiple |
|---|---|---|
| High | 1.4x | 0.9x |
| Median (excluding Airgas) | 0.9x | 8.2x |
| Low | .3x | 8.1x |
| Airgas | .9x | 9.6x |

None of the selected comparable companies is identical to Airgas. Accordingly, a complete analysis of the results of the foregoing calculations cannot be limited to a quantitative review of the results and involves complex considerations and judgments concerning differences in financial and operating characteristics of the selected comparable companies and other factors that could affect the public trading dynamics of the selected comparable companies, as well as those of Airgas.

Based on the information in the table above and BofA Merrill Lynch's analyses of the various comparable companies and its professional judgment and experience:

- BofA Merrill Lynch applied a reference range of 2016 enterprise value/EBITDA Multiples of 9.0x to 10.5x to the estimate of Airgas' 2016 EBITDA reflected in the Forecasts to derive a reference range of implied per share values for Airgas of $94.25 to $114.75 (rounded to the nearest $0.25); and

- BofA Merrill Lynch applied a reference range of 2016 P/E multiples of 17.0x to 21.0x to the estimate of the Airgas' 2016 EPS reflected in the Forecasts to derive a range of implied enterprise values, subtracted from the range of implied enterprise values the amount of Airgas' net debt as of September 30, 2015 and divided the result by the number of fully diluted shares of Airgas common stock to derive a reference range of implied per share values for Airgas of $91.75 to $113.25 (rounded to the nearest $0.25) based on the 2016 EPS estimate.

66.     These statements in the Proxy are rendered false and/or misleading by the omissions identified in ¶60 because such omissions are essential to stockholders' ability to properly evaluate the analysis performed by BofA.  Moreover, each of the selected comparable companies used in the analysis was chosen because BofA felt they all shared similarities to Airgas.  Invariably, however, some types of companies will share more similarities to Airgas than others, so information relating to BofA's perspectives on relative comparability is vital when evaluating the multiples implied by the Company's forecasts compared to the multiples from the companies BofA's selected as part of this analysis.  In sum, without the aforementioned information, stockholders' ability to understand BofA's analysis is significantly limited, rendering them unable to make a fully-informed decision whether to vote to approve the Proposed Transaction.

67.     Similarly, with respect to BofA's and Goldman Sachs' *Selected Precedent Transactions Analysis* (page 39),  three of  the six transactions examined are over ten years old and a fourth transaction is nearly ten years old, but the Proxy fails to explain how those older

transactions are comparable to the Proposed Transaction.  Further, the Proxy fails to disclose (i) BofA's and Goldman Sachs' objective selection criteria in choosing the selected transactions to analyze; (ii) the LTM EBITDA multiples for each of the selected transactions observed in its analysis; (iii) whether the selected ranges disclosed represent the high/low for all of the transactions identified in the Proxy; and (iv) whether BofA and/or Goldman Sachs determined any other multiple for the selected transactions.

68.     The omission of this information renders the following statements in the Proxy on pages 39-40 false and/or materially misleading in contravention of the Exchange Act:

*Selected Precedent Transactions Analysis*

The Financial Advisors analyzed certain publicly available information relating to the acquisition transactions listed below involving target companies with businesses that for purposes of analysis may be considered similar to those of Airgas.

| Date Announced | Acquiror(s) | Target |
|---|---|---|
| 13-Jul-99 | Air Liquide and Air Products and Chemicals, Inc. | The BOC Group plc |
| 16-Aug-99 | The Linde Group | AGA S.A. de C.V. |
| 20-Jan-04 | Air Liquide | Messer Griesheim |
| 6-Mar-06 | The Linde Group | The BOC Group plc |
| 19-Jun-12 | Air Products and Chemicals, Inc. | Indura S.A. |
| 5-Feb-13 | Praxair, Inc. | NuCo2 Inc. |

The Financial Advisors calculated the enterprise value for each target company by multiplying the amount of the announced per share consideration paid or payable in the applicable transaction by the number of fully diluted outstanding shares of the target company based upon publicly available information for the target company and adding to the result the amount of the target company's net debt as of the date of the target company's most recent balance sheet prior to the announcement of the transaction.

For each of the transactions, the Financial Advisors calculated the transaction value as a multiple of EBITDA of the target company for the most recently reported 12 months prior to the date of announcement of the transaction, which we refer to as the "LTM EBITDA Multiple." The LTM EBITDA Multiples for the selected transactions ranged from approximately 10x to 12.9x.

Although none of the selected transactions are directly comparable to the proposed merger, the target companies in the selected transactions were companies with operations that, for the purposes of analysis, may be considered similar to certain of Airgas' financial results, and as such, for purposes of analysis, the selected transactions may be considered similar to the merger

*BofA Merrill Lynch*

Based on the foregoing and BofA Merrill Lynch's analyses of the various transactions and its professional judgment and experience, BofA Merrill Lynch applied a reference range of LTM EBITDA Multiples of 10.0x to 12.0x to Airgas' last twelve months EBITDA as of September 30, 2015 as provided by Airgas management, to derive a range of implied enterprise values for Airgas. BofA Merrill Lynch subtracted from the range of implied enterprise values the amount of Airgas' net debt as of September 30, 2015 and divided the result by the number of fully diluted shares of Airgas common stock to derive a reference range of implied per share values for Airgas of $97.00 to $122.25 (rounded to the nearest $0.25).

*Goldman Sachs*

Based on the foregoing and Goldman Sachs's analyses of the various transactions and its professional judgment and experience, Goldman Sachs applied a reference range of LTM EBITDA Multiples of 10.0x to 12.9x to Airgas' last twelve months EBITDA as of September 30, 2015 as provided by Airgas management, to derive a range of implied enterprise values for Airgas. Goldman Sachs subtracted from the range of implied enterprise values the amount of Airgas' net debt as of September 30, 2015 and divided the result by the number of fully diluted shares of Airgas common stock to derive a reference range of implied per share values for Airgas of $97 to $134.

69.     These statements in the Proxy are rendered false and/or misleading by the

omissions identified in ¶63 because, without the objective selection criteria employed by BofA

and Goldman Sachs and the individually observed multiples for the chosen comparable

transactions, stockholders are unable to adequately assess whether Airgas is being appropriately

valued in relation to precedent transactions selected and reviewed by BofA and Goldman Sachs. For example, without this information, stockholders have a limited ability to gauge whether the applied multiples are appropriate given the differences between Airgas and the subject transactions.

70.     With respect to BofA and Goldman Sachs' *Illustrative Discounted Cash Flow ("DCF") Analysis* (page 42), the Proxy fails to disclose: (i) the definition/formula for unlevered free cash flow; (ii) the rationale for applying discount rates of 6.255% to 7.50% (for BofA) and 7.125% to 7.625% (for Goldman Sachs); (iii) whether the weighted average cost of capital ("WACC") was derived through the capital asset pricing model ("CAPM"), and if so disclose the market assumptions (i.e., risk free rate, two year beta, and equity risk premium); and (iv) the implied perpetuity growth rate range corresponding to the assumed terminal pricing multiples resulting from this analysis (for BofA's analysis).

71.     The omission of this information renders the following statements in the Proxy at page 42, false and/or materially misleading in contravention of the Exchange Act:

*Illustrative Discounted Cash Flow Analysis*

Using the Forecasts each of the Financial Advisors performed a discounted cash flow analysis of Airgas to derive a range of illustrative present values per share of Airgas common stock.

*BofA Merrill Lynch*

Using discount rates ranging from 6.25% to 7.50%, reflecting BofA Merrill Lynch's estimate of Airgas' weighted average cost of capital, or "WACC," BofA Merrill Lynch discounted to present value as of September 30, 2015, (i) estimates of the unlevered free cash for Airgas during the period from September 30, 2015 through December 31, 2020, as reflected in the Forecasts, and (ii) a range of illustrative terminal values for Airgas as of December 31, 2020 calculated by applying to estimated terminal year normalized EBITDA for Airgas, as reflected in the Forecasts, implied enterprise value/EBITDA multiples ranging from 9.5x to 11.0x. BofA Merrill Lynch derived ranges of illustrative

enterprise values for Airgas by adding the ranges of present values it derived based on the estimated unlevered free cash flows of Airgas for the period from September 30, 2015 through December 31, 2020 and the ranges of present values it derived based on the illustrative terminal values for Airgas as of December 31, 2020. BofA Merrill Lynch subtracted from the range of illustrative enterprise values it derived, Airgas' net debt as of September 30, 2015, and divided the results by the number of fully diluted outstanding shares of Airgas common stock, calculated based on information provided by Airgas management, to derive illustrative present values per share of Airgas ranging from $124.25 to $155.75 (rounded to the nearest $0.25).

*Goldman Sachs*

Using discount rates ranging from 7.125% to 7.625%, reflecting Goldman Sachs' estimate of Airgas' WACC, Goldman Sachs discounted to present value as of September 30, 2015, (i) estimates of the unlevered free cash for Airgas during the period from September 30, 2015 through December 31, 2020, as reflected in the Forecasts, and (ii) a range of illustrative terminal values for Airgas as of December 31, 2020 calculated by applying implied perpetuity growth rates ranging from 2.0% to 3.0% to estimated terminal year unlevered free cash flow for Airgas, as reflected in the Forecasts. Goldman Sachs derived ranges of illustrative enterprise values for Airgas by adding the ranges of present values it derived based on the estimated unlevered free cash flows of Airgas for the period from September 30, 2015 through December 31, 2020 and the ranges of present values it derived based on the illustrative terminal values for Airgas as of December 31, 2020. Goldman Sachs subtracted from the range of illustrative enterprise values it derived, Airgas' net debt as of September 30, 2015, and divided the results by the number of fully diluted outstanding shares of Airgas common stock, calculated based on information provided by Airgas management, to derive illustrative present values per share of Airgas ranging from $105.00 to $152.00.

72.     The Proxy is false and/or misleading due to the omissions identified in ¶66 for a variety of reasons.  First, the key input underlying BofA and Goldman Sachs' DCF analysis are the Company's estimated unlevered free cash flows.  Second, because DCF analyses are extremely sensitive to derivations in the inputs used (particularly those impacting projected cash flows), it is imperative that stockholders be provided with the information underlying the implied perpetuity growth rate range selected.  Without the aforementioned omitted information, Airgas stockholders cannot understand and gauge the weight of the multiples derived and per share equity value ranges determined under this analysis and cannot evaluate for themselves whether

the analysis was performed properly and, in turn, determine what weight, if any, they should place on the analysis (and BofA's and Goldman Sachs' fairness opinion as a whole) when deciding whether to vote to approve the Proposed Transaction.

73.     Defendants' failure to provide Airgas' stockholders with the foregoing material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder.  The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiffs and the other members of the Class will be unable to make a fully-informed decision whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

74.     Plaintiffs and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law.

## COUNT I

**Claims for Violations of Sections 14(a) and of the Exchange Act
Against the Company and the Individual Defendants**

75.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

76.     Defendants have issued the Proxy with the intention of soliciting stockholder support for the Proposed Transaction.

77.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with stockholders shall not contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or

misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

78.     Specifically, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts as set forth *supra*.   Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy is materially misleading and omits material facts that are necessary to render it non-misleading.

79.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of her entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.   As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT II

### Claims for Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

80.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

81.     The Individual Defendants acted as controlling persons of Airgas within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of their positions as officers and/or directors of Airgas and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false or materially incomplete and therefore misleading.

82.     Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

83.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.   The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.   Thus, the Individual Defendants were intimately connected with and directly involved in the making of this document.

84.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.   The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

85.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

86.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.   By virtue of their positions as controlling

persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' conduct, Plaintiff will be irreparably harmed.

87.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor and in favor of the Class, and against the Defendants as follows:

A.    Certifying this case as a class action, certifying Plaintiff as class representative and his counsel as Class counsel;

B.    Preliminarily and permanently enjoining the Defendants and those acting in concert with them from consummating the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

C.    To the extent the Proposed Transaction is consummated prior to the Court's entry of a final judgment, rescinding it and setting it aside or awarding rescissory damages;

D.    Directing Defendants to account to Plaintiff and the Class for all damages suffered by them as a result of Defendants' wrongful conduct;

E.    Awarding Plaintiff the costs, expenses, and disbursements of this action, including any attorneys' and experts' fees and, if applicable, pre-judgment and post-judgment interest; and

F.    Awarding Plaintiff and the Class such other relief as this Court deems just, equitable, and proper.

Dated: December 23, 2015                    **FARUQI & FARUQI, LLP**

                                            By: ___/s/ *James R. Banko*___ JRB9686
                                            James R. Banko
                                            (Pa. ID  63344)
                                            101 Greenwood Ave. Suite 600
                                            Jenkintown, PA 19046
                                            Tel.: (215) 277-5770
                                            Fax: (215) 277-5771
                                            Email: jbanko@faruqilaw.com

                                            *Attorneys for Plaintiff*

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
Juan E. Monteverde
James M. Wilson, Jr.
685 Third Avenue, 26th Fl
New York, NY10017
Tel.: (212) 983-9330
Fax: (212) 983-9331

*Attorneys for Plaintiff*

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Jason Wojcicki ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against Airgas, Inc. ("Airgas") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in Airgas securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 22 day of December, 2015.

_Jason Wojcicki_
Jason Wojcicki

| Grant Date | Purchase Date | Transferable Date | Price | Purchased | Salable |
|---|---|---|---|---|---|
| 10-01-13 | 01-02-14 | 01-02-16 | $92.6915 | 4.694 | |
| 07-01-13 | 04-01-14 | 04-01-16 | $82.875 | 8.0848 | 4.694 |
| 04-01-14 | 07-01-14 | 07-01-16 | $91.375 | 7.5643 | 8.0848 |
| 04-01-14 | 10-01-14 | 10-01-16 | $91.375 | 7.7906 | 7.5643 |
| 04-01-14 | 01-01-16 | 01-01-17 | $91.375 | 6.5157 | 7.7906 |
| 04-01-14 | 04-01-15 | 04-01-17 | $89.3265 | 7.9174 | 6.5157 |
| 04-01-15 | 07-01-15 | 07-01-17 | $89.3265 | 7.0891 | 7.9174 |
| 04-01-15 | 10-01-15 | 10-01-17 | $74.7745 | 10.7245 | 7.0891 |
| | | | | | 10.7245 |